Per Cueiam:
This case was referred to Trial Commissioner Joseph V. Colaianni with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Buie 134(h). The commissioner has done so in an opinion and report filed on August 30, 1972. Exceptions to the commissioner’s opinion, findings of fact and recommended conclusion of law were filed by plaintiff and the case has been submitted to the court on the briefs of the parties and oral argument of plaintiff, pro se, and the attorney for defendant. Since the court agrees with the commissioner’s opinion, findings of fact and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, *670 plaintiff is not entitled to recover and bis petition is dismissed.
ORINION OK COMMISSIONER
Colaianni, Commissioner:
Tbis is a patent suit under 28 U.S.C. § 1498. Plaintiff, Louis Strumskis, seeks “reasonable and entire compensation” for unauthorized use by tbe Government of plaintiff’s patented invention. Only tbe broad issue of liability is before tbe court; accounting, if any, is deferred to later proceedings. The patent in suit is United States Letters Patent No. 3,155,065 (hereinafter tbe “Strumskis” patent), issued on November 3, 1964, to Louis Strumskis on an invention entitled “Ship Stabilizer.” Plaintiff has continuously been tbe sole and exclusive owner of all rights, title and interest in said patent.
Tbis litigation, as originally framed, included tbe usual issues of patent validity and infringement. However, at tbe trial defendant agreed, for purposes of tbis proceeding only, to rely solely upon the defense of noninfringement. While tbe Strumskis patent has five claims, plaintiff only urges that defendant has infringed claim 5.

Bachgromd

Tbe patent in suit relates to a system which is capable of propelling and steering ships while at the same time stabilizing them from pitch and roll. The system, which is fully described in findings 4 and 5, includes a pair of water inlet ducts that extend from each side of the craft and terminate in water discharge ports at the craft’s stern. In addition, a Y-shaped duct which spans the entire length of the craft is provided with a pair of inlet ports at the ship’s bow and a single outlet port at the ship’s stern. Each of the three intake ducts is equipped with separate multi-blade, open-center propeller mechanisms. Vertically mounted blades or fins are arranged relative to the outlet ports of the water intake tubes for steering of the ship. Stabilization is achieved by gyroscope-controlled hydraulic jacks which, in turn, operate individual arrays of fins that are positioned at the intake ends of the side ducts. Each of the tubes may be sealed by *671 a gate mechanism at the inlet ports. Finally, manholes are provided for access to the water ducts.

The Patent Claim

Claim 5, the only claim which plaintiff alleges has been infringed by the United States, provides:
5. A ship stabilizer of the character described, comprising three water conducting tubes mounted within the hull of a ship, one of the said tubes being Y-shaped at the bow of the said ship and extending from the bow to the stern of the said ship, and each of the two remaining tubes mountd [sic] on each side of the said ship, and each tube having a mechanically controlled water inlet and a water outlet having a plurality of blades therein, the said outlet blades of said two removing tubes being mounted vertically, thereby providing an improved means of steering the said ship, and a propeller of the multi-blade type mounted on bearings and within each one of the said tubes, and a power unit operating each propeller, and the mechanical mechanism of each water inlet embodying a plurality of swingably mounted, horizontally disposed fins in equal vertical-spaced relation to each other, the said fins being mechanically connected to a hydraulic jack automatically operated by a gyrosope [sic], thereby providing automatic stabilization of the said ship, and each said water inlet having a sliding door valve therein, thereby providing a means of preventing water from entering the water conducting tubes while they are being repaired or cleaned out, and a manhole in the upper and forward and rearward ends of each of the three water conducting tubes, the manholes also providing a means of maintenance of the inside of the said water conducting tubes.

Infringement

The trial record fails to support plaintiff’s charge of infringement. Plaintiff has, for reasons which follow, failed to convincingly prove that defendant, during the six years immediately preceding the filing of this action, procured and/or used the invention covered by claim 5 of plaintiff’s patent.
Defendant admits, see finding 9, to having procured and/or used six water jet-stream craft of standard commer *672 cial design during the relevant six-year period. Both plaintiff and defendant agree, as indicated by finding 10, that none of these six boats, as originally procured, infringed his patent. The parties further agree that repairs made to five of the craft during their Coast Guard service did not change their original configurations in such a way as to amount to infringement of claim 5 of plaintiff’s patent. However, plaintiff continues to urge, see finding 13, that certain structural alterations and changes were made to the sole remaining craft, bearing Coast Guard identification CG-180075, such that a new configuration, which does infringe claim 5 of his patent, resulted.
Plaintiff contends that he has adequately demonstrated and proved that defendant has, without his authorization or consent, utilized his patented invention. Plaintiff has attempted to show that defendant has infringed claim 5 of his patent through a number of independent and unrelated theories. Each of plaintiff’s theories will be discussed. Plaintiff’s charge that defendant has by its actions admitted to having infringed claim 5 of plaintiff’s patent will be initially dealt with.
Plaintiff, during trial and in his post-trial submissions, has stressed defendant’s failure to execute a so-called March 21, 1969, stipulation of dismissal. Plaintiff’s March 21,1969, offer of dismissal was treated by the trial commissioner as a contingent motion to dismiss under what is now Pule 102(a) (1) (iii) of this court, see finding 14. Moreover, since it was not executed, as the conditions of the offer required, by the Commandant of the U.S. Coast Guard within the 10 days during which plaintiff’s offer was to remain open, the motion was denied on April 2,1969.
Plaintiff contends that an innocent party would have quickly accepted his offer of dismissal. Plaintiff thus reasons that the only explanation for defendant’s failure to act is that defendant must have been using an open-center propeller on its water jet craft. Based on the above, plaintiff urges that defendant’s failure to accept his offer should be interpreted by this court as an admission of infringement.
Defendant, on the other hand, contends, inter alia, that *673 plaintiff’s offer was not accepted because it should have been directed to the Department of Justice and not to the Commandant of the U.S. Coast Guard, and also because the offer was unclear and ambiguous. Defendant further contends that its failure to act on plaintiff’s offer cannot be taken as an admission of infringement because such charges were formally and categorically denied by its answer to plaintiff’s petition. Defendant also argues that plaintiff’s offer was unacceptable because it would not have been dispositive of plaintiff’s charges of infringement, and thus would have amounted to little more than a useless act.
Particularly, defendant points out that a careful reading of the alleged offer of dismissal, see finding 14(a), shows it to be premised solely on the Coast Guard’s use or nonuse of an open-center propeller. Defendant correctly points out that the Coast Guard’s use or nonuse of an open-center propeller would not be dispositive of the issue involved in this case because claim 5 of plaintiff’s patent is directed to a ship stabilizer that calls for a number of other structural elements in addition to an open-center propeller.
Accordingly, it is concluded that defendant’s explanation is reasonable and justifies its failure to act on plaintiff’s offer of dismissal. It is further concluded that defendant’s action or nonaction relative to plaintiff’s March 21, 1969, motion does not amount to an admission of infringement of claim 5 of plaintiff’s patent.
Plaintiff offered no documents nor oral testimony to show that defendant had indeed infringed claim 5 of his patent. Instead, plaintiff, in addition to his contentions that defendant has admitted to infringing his patent, bases his arguments on a number of inferences which appear to be nothing more than extrapolations of alleged unrelated facts. For example, it appears that the grounds for plaintiff’s original complaint of infringement took shape after plaintiff was allegedly informed by an unidentified retired Coast Guardsman, see finding 13, of the capability of certain of that service’s water jet craft to attain speeds as high as 47 m.p.h. Plaintiff also claims to have established, as a result of a telephone conversation which he had with a Coast Guards *674 man who was serving on the USS Foxglove, that Coast Guard craft CG-180075 was capable of achieving speeds as high as 47 m.p.h.
Plaintiff argues that a water jet craft would not be capable of reaching such high speeds unless it had been modified in a manner as disclosed by claim 5 of his patent. However, none of the witnesses who appeared at the trial testified that CG-180075, the only water jet craft which plaintiff now charges with infringement of his patent, was capable of achieving a speed of 47 m.p.h. Furthermore, even if it can be assumed that plaintiff had convincingly shown that one or more of the Coast Guard’s water jet craft was capable of reaching a speed of 47 m.p.h., plaintiff’s argument would still fall far short of proving his claim of infringement. Plaintiff’s arguments fall short of their mark because he has not shown with any degree of certainty that the water jet craft which allegedly reached those high speeds incorporated all of the structural elements of the patented construction defined by claim 5.
Plaintiff next points to a $1,026.38 increase in the value placed on the hull of CG-180075 as evidence of a significant structural modification or alteration having occurred. Plaintiff hypothesizes that the $1,026.33 increase in value would be enough to pay for the building and installation of an open-center propeller on Coast Guard craft CG-180075. Plaintiff, however, offered no documents nor witnesses to support his claims.
Defendant offered no satisfactory explanation for the increase in value of the hull of craft CG-180075. Nonetheless, plaintiff’s speculations on what might have occurred are unconvincing for several reasons.
In the first place, defendant produced a number of witnesses who testified that changes such as plaintiff indicates must have occurred to CG-180075 would have required authorization from Coast Guard headquarters. However, a search of areas where such records would be stored failed to turn up any such authorization. They further testified that detailed drawings would have been necessary in order to make the type of structural changes which plaintiff contends occurred to CG-180075, but that a search of areas where such *675 drawings would be kept failed to produce any relevant drawings.
Defendant also points out that the changes, such as plaintiff contends were made to CG-180075, would have been recorded in the Coast Guard boat records for that craft. A review of the records in evidence fails to indicate that any structural changes such as plaintiff urges occurred.
In sum, as more fully treated in findings 17 through 22, defendant’s witnesses testified that a thorough search failed to uncover any records, drawings, or documents which indicate that structural-type changes, such as are called for by claim 5 of plaintiff’s patent, were made to CG-180075.
Defendant, however, urges that plaintiff’s charge of infringement is untenable for an even more fundamental reason. Specifically, defendant points out that plaintiff appears to be urging that the use by the Coast Guard of an open-center propeller in CG-180075 is enough to establish infringement of claim 5. The following statement from pp. 5-6 of plaintiff’s November 1,1971, reply brief confirms that to be plaintiff’s position:
The center of Defendant’s Questions found in page 1 of his Part I rests in the vague belief that each and every structurally claimed “mechanism” and act in a conglomerate patent must be found crammed within a singular and accused “mechanism” and act, to infringe.
To say that the entire conglomerate of a patent, rather than that one particular “mechanism” therefrom-and-in-question, must be present in that one accused “mechanism” in order to inf ringe * * * is an absurdity. But to heed such an absurdity would be legally disastrous to any similar and forthcoming Case, for such an imbalance is contrary to basic law. [Underscoring in original.]
*****
* * * The only issue at hand lies in Defendant's usage of Plaintiff’s unique oven-center propeller mechanism. [Italic supplied.]
Plaintiff’s position, as stated above, is incorrect and does not agree with all known standards and definitions of patent infringement.
This court has consistently maintained that the metes and bounds of an invention are defined by the claims of a patent and not its drawings or specification. Kuhne Identification *676 Systems, Inc. v. United States, 82 Ct. Cl. 237, 258, 28 USPQ, 151 (1936); Badowski v. United States, 143 Ct. Cl. 23, 27, 164 F. Supp. 252, 255, 118 USPQ 358, 361 (1958).
Equally long established is the necessity to resort to the language of the patent claims in determining whether or not an accused device infringes a patent. Dvorsky v. United States, 173 Ct. Cl. 638, 352 F. 2d 373 (1965), cert. denied, 89 S. Ct. 456, 393 U.S. 983 (1968). As explained in Dvorshy, patent claims are required by statute, 35 U.S.C. § 112, for the very purpose of forcing a patentee to particularly point out and distinctly claim the subject matter which is regarded to be the invention.
In Autogiro Co. of America v. United States, 181 Ct. Cl. 55, 60, 384 F. 2d 391, 395-96, 155 USPQ 697, 701 (1967), rehearing denied, 184 Ct. Cl. 801 (1968), this court clearly stated:
The claims of the patent provide the concise formal definition of the invention. * * * It is to these wordings that one must look to determine whether there has been infringement.
In this instance, plaintiff’s claim 5 comprises all of the elements which the Patent Office considered to be necessary to define plaintiff’s ship stabilizer. All the elements which make up the combination defined by claim 5 are considered to be material and necessary. Fay v. Cordesman, 109 U.S. 408, 420 (1883). Accordingly, the omission of any one of the elements making up the claimed combination avoids all charges of infringement. This last principle was announced by the Supreme Court, at least as early as 1842, in the case of Prouty v. Draper, 41 U.S. (16 Pet.) 336, and has been consistently followed by this court. See Pacific Submarine (& Earthquake Proof Wall Co. v. United States, 19 Ct. Cl. 234 (1884); Autogiro Co. of America, supra, at 72, 384 F. 2d at 403.
Turning now to a review of the structural combination covered by claim 5, and comparing it to the accused water jet craft, it is concluded, for reasons more fully set out in findings 17 through 22, that plaintiff’s charge of infringement is unsubstantiated and unsupported. Particularly, plaintiff candidly admits that none of the water jet-stream *677 craft as originally procured or allegedly altered or modified ever included a gyroscope. Claim 5 specifically calls for a gyroscope, and for this reason alone plaintiff has failed to sustain his charge of infringement with regard to claim 5. Moreover, plaintiff has not shown that defendant has procured or modified any of the sis pertinent water jet craft to include three water conducting tubes in the hulls of the ships, open-center propellers, hydraulic jack operated fins, or many of the other elements called for by claim 5. In sum, plaintiff has not shown that during the six years relevant to this proceeding defendant has procured, modified or used any water jet craft having the structural combination called for by claim 5 of his patent.
It is thus concluded that defendant has not infringed claim 5 of plaintiff’s patent. It is felt to be unnecessary to consider the validity of claim 5.
Plaintiff is not entitled to recover and his petition is dismissed.
FINDINGS on Fact
1. This is a patent suit arising -under the provisions of 28 U.S.C. § 1498 for reasonable and entire compensation for unauthorized use of an invention described and claimed in United States Letters Patent No. 3,155,065 entitled “Ship Stabilizer,” issued on November 3,1964, to Louis Strumskis on an application filed May 3,1963.
2. Plaintiff, Louis Strumskis (hereinafter sometimes referred to as “Strumskis”), is currently, and has been continuously from its date of issuance, the sole owner of all rights, title and interest in the patent in suit. The petition was filed August 14, 1968, by Mr. Strumskis, pro se.
3. In accordance with the provisions of Eule 131 (c), the issues before the court were initially limited to patent validity and infringement. The issue of accounting was deferred until after a ruling by the court on the issues of validity and infringement. During trial defendant agreed, for purposes of this proceeding only, to rely solely upon the defense of noninfringement.
4. The patent in suit relates to a system which not only prevents the roll and pitch of ships, but also propels and steers the ships over a wide range of speeds. The specifica *678 tion of the patent sets forth a number of objects of the invention. The following are felt to be the most pertinent to the questions at bar:
It is the principal object of my invention to provide a ship stabilizer that is operated by the action of the water passing through certain conducting pipes, as will be hereinafter described.
Another object of this invention is to provide a ship stabilizer that has its stabilizing movements made with a hydraulic j ack activated by a gyroscope.
Another object of this invention is to provide a ship stabilizer in connection with the propelling mechanism that will eliminate cavitation found in the ordinary propeller movement at high speed.
Another object of this invention is to provide a ship stabilizer that is so constructed as to also do away with the necessity of a rudder for steering by reason of the action of the water passing through the pipes and acting on the fins, as will be described in detail later on in this specification.
5. The specification of the patent in suit describes the structure, in connection with Figs. 1-5 which are reproduced herein, as follows:
* * * there is generally indicated by the character 8 a ship’s hull in which is located a water conducting tube 9 that extends from the bow 10 of the ship to the stern 11. The tube 9 is Y-shaped at the bow and is provided with a pair of parallel and spaced, forward facing openings 12, to which is connected a sliding gate mechanism 18 that controls the amount of water entering the aforesaid conducting tube 9. A suitable power supply unit 14 of any desired type is located just above the tube 9 which is provided with a propeller housing 15 having a propeller 16 of the multiple blade type located therein. The power supply unit and the propeller and housing are located in the stem portion of the ship. The aforesaid conducting tube terminates at the stern in an outlet 17 having a sliding door valve 18.
A separate stabilizing unit 19 is located on one side of the ship, while an alike stabilizing unit 20 is located on the other side of the ship. Each stabilizing unit embodies a conducting tube 21 having a water inlet 22 on the forward end thereof. Each water inlet comprises a fin supporting structure 23, in which is located a plurality of fins 24 having a supporting shaft 25 at one end thereof and a second supporting shaft 26 at the opposite end of *679 the fin 24. The supporting shaft 25 terminates in a bearing housed in a cap 28, while the supporting shaft 26 passes through a bearing 29 and terminates in a hydraulic jack operating mechanism 30 that is operated by the hydraulic jack 31, which is activated by a gyroscope 35. One takeoff from this gyroscope is connected by line 36 to the hydraulic jack 31 in tube 9 and another takeoff is connected by lines 37 to hydraulic jacks 31 in tubes 19 and 20. This gyroscope operates the jacks in a conven *680 tional manner well known in the skip stabilization art. * * *

*679

*680 * * * The pitch of the propeller blades can be automatically adjusted to any forward or reverse movement without the necessity of stopping its rotational movement. The feathering of the propeller blades is sometimes desired and can, of course, be done by mechanism well known in the art when one desires constant speed for high efficiency. The feathering of the propellers of a ship would be similar to the feathering of the propellers of an airplane. The main source of the ship’s thrust, aside from the “pull-push” effect of the water flowing through the tubes on the water outside the ship, is the “biting” effect of the rotating propeller blades on the water; therefore, bearings (not shown in the drawing) are placed externally on either side of the aforesaid housing 15, in order to support the constant thrust produced by the propeller.
For more efficient guiding or steering of a ship than is possible with the present well-known rudder system, the blades 34 that are located in the outlets 17 may be mounted vertically, even while there is no forward or backward movement of the ship, if the water in the center tube, that is, the conducting tube 9, is caused to flow in reverse.
It may be well to remark at this time that the water inlets 22, which are parallel to the ship’s side, do not protrude and in any way interfere with the docking of the ship, but rather help the docking by eliminating the use of tug service. The fins 24 located within the aforesaid water inlets 22 on each side of the ship obviously control the roll of the ship on which they are located, since these fins will operate inversely to each other at the automatic command of the already mentioned gyroscopes. The novel way in which the fins 24 are parallel to the side of the ship will naturally reduce the rolling motion of the ship without the necessity of reducing the ship’s speed in order to reduce the side shock that is created by the use of the wing-type stabilizers.
6. Claim 5, the only claim in issue, is set out in outline form below:
5. A ship stabilizer of the character described, comprising
three water conducting tubes mounted within the hull of a ship,
*681 one of the said tubes being Y-shaped at the bow of the said ship and extending from the bow to the stern of the said ship,
and each of the two remaining tubes monntd [sic] on each side of the said ship,
and each tube having a mechanically controlled water inlet and a water outlet having a plurality of blades therein,
the said outlet blades of said two removing tubes being mounted vertically, thereby providing an improved means of steering the said ship,
and a propeller of the multi-blade type mounted on bearings and within each one of the said tubes,
and a power unit operating each propeller,
and the mechanical mechanism of each water inlet embodying a plurality of swingably mounted, horizontally disposed fins in equal vertical-spaced relation to each other, the said fins being mechanically connected to a hydraulic jack automatically operated by a gyrosope [sic],
thereby providing automatic stabilization of the said ship,
and each said water inlet having a sliding door valve therein,
thereby providing a means of preventing water from entering the water conducting tubes while they are being repaired or cleaned out,
and a manhole in the upper and forward and rearward ends of each of the three water conducting tubes,
the manholes also providing a means of maintenance of the inside of the said water conducting tubes.
7. Water jet-stream craft are distinguishable from the more customary propeller-driven craft in that they draw water through appropriate water intake openings. A suitable pump arrangement is employed to increase the velocity and pressure of the water. The speed of the water jet craft is proportional to the velocity of the water which is discharged *682 through an opening at the stem. Steering of water jet craft is achieved by controlling the position of deflector plates relative to the water outlet. The ability of water jet craft to operate in only a few inches of water enables' them to substantially outperform their propeller-driven counterparts insofar as shallow water operation is concerned. The speed capabilities of water jet craft appear to be in dispute. Plaintiff claims that water jet craft having a construction as called for by claim 5 of his patent are capable of speeds as high as 47 m.p.h. However, no testimony was submitted to substantiate his claim.
8. Plaintiff appears to be contending that defendant, through the U.S. Coast Guard, has within the six years immediately preceding the filing of this suit, procured and/or used jet-stream craft which infringe claim 5 of his patent.
9. Defendant admits to procuring and/or using a number of jet-stream boats during the relevant six-year period. Among the boats which defendant admits to having procured and/or used during the period of August 14, 1982, and August 14, 1968, inclusive, are two 21-foot craft, each equipped with Jacuzzi jet pump propulsion units and bearing Coast Guard identification numbers CG-21045 and CG-21046. Defendant also admits to procuring and/or using one 18-foot and three 22-foot jet craft from the Turbocraft Division of the Buehler Corporation of Indianapolis, Indiana, bearing respectively identification numbers CG-180075, CG-22111, CG-22112 and CG-22113 during the period relevant to this particular suit.
10. The parties are apparently in agreement, and no evidence to the contrary is currently before the court, that the six identified jet craft were procured by the Coast Guard as standard off-the-shelf-commercial items, and that as originally procured the craft did not infringe claim 5 of plaintiff’s patent.
11. The evidence introduced during the trial showed that only standard repair-type changes were made to Coast Guard craft CG-21045 and CG-21046. Nothing was introduced, by way of testimony or documents, to show that any struc *683 tural changes were made by the Coast Guard during the time that these accused craft remained in service.
12. Similarly, no evidence was introduced to show that structural changes were made by the Coast Guard to craft CG-22111 through CG-22113. Official Coast Guard boat reports of these craft indicated that only repairs which were necessary to enable them to be kept in operation were made.
13. (a) Coast Guard craft CG-180075 appears to be the only craft which plaintiff contended was modified in an allegedly infringing manner. During pretrial discovery plaintiff attempted, without success, to determine the types of structural changes made by the Coast Guard on CG-180075.
(b) Plaintiff’s attention was initially drawn to CG-180075 through alleged discussions with Coast Guard service personnel. These discussions apparently convinced plaintiff of the craft’s ability to reach speeds of 47 m.p.h. The particular individuals alleged to have made the statements to plaintiff did not appear as witnesses. Based upon the alleged speed capabilities of CG-180075 relative to standard commercial jet boats, which were only capable of attaining speeds of between 20 and 30 m.p.h., plaintiff concluded that the craft must have been modified in a way as disclosed by claim 5 of his patent.
(c) On March 4, 1969, the trial commissioner issued an order for call on the U.S. Coast Guard, Department of Transportation. The call ordered the Coast Guard to file with the Clerk a drawing of the character described in plaintiff’s motion to subpoena drawing filed February 10, 1969. Plaintiff’s motion requested a drawing of a—
* * * water jet-stream propeller mechanism, embodying an open-center * * * passageway mechanism within a tube, activated from outside this water passage; * * * as found in the water jet-stream boats, 16 ft. to 24 ft., manufactured by the Ü.S. Coast Guard * * * [at the U.S. Coast Guard Yard, Curtis Bay, Baltimore, Md., and which enabled these Coast Guard boats to achieve] the heretofore unheard-of speeds of 47 m.p.h. * * *.
(d) Defendant has steadfastly maintained, by way of response to the call and through witnesses at trial, that no draw *684 ings of the propeller mechanism sought by plaintiff ever existed.
14. (a) Plaintiff, on March 21, 19.69, filed with the Clerk of the court, a paper entitled “Stipulated and Prejudiced Offer to Dismissal.” The trial commissioner treated the paper as a contingent motion to dismiss under what was then Eule 67(a) (1) (iii). The motion provided for dismissal of the suit if the Commandant of the Coast Guard would admit, within 10 days, that the Coast Guard was not then—
* * * using any water jet-stream craft which do [sic] posess [sic] an open-center-passageway propeller mechanism within a tube, which propeller does contain it’s [sic] bearings on either side and outside the water passageway, which same propeller mechanism is activated from outside this same water passage; * * *.
(b) Defendant did not formally respond to plaintiff’s March 21, 1969, motion and, thus, after the passage of the allowed 10 days for acceptance, it was denied.
15. (a) The testimony during trial and the documents submitted into evidence establish that the single 18-foot jet-stream craft (the craft actually had a length of 17 feet 10 inches), which was later to bear Coast Guard identification No. 180075, was obtained by the Coast Guard pursuant to order CG-54,155-A, and a January 17, 1962, contract No. Tcg-41911, from the Turbocraft Division of the Buehler Corporation of Indianapolis. The water jet-stream propelled craft was of Fiberglas construction and included a standard Buehler design, Model 75-3 multi-stage, 7% inch diameter, axial-flow pump propulsion unit.
The craft was provided with a single intake for the pump unit. This single intake was positioned on the bottom of the boat adjacent to the stem and carried water from the intake port to a discharge outlet located in the stern of the boat. Three axially-aligned, shaft-mounted propellers, were employed.
The commercially delivered craft was not provided with water conducting tubes at either of the ship’s sides. Further, sliding door valves were not provided at the single bottom positioned inlet. Also, the Buehler craft was not equipped *685 with a hydraulic jack nor a gyroscope to operate the same. Finally, the craft did not come equipped with an open-center propeller such as shown in Fig. 4 of plaintiff’s patent.
(b) The Coast Guard procured the craft in order to compare the operational effectiveness of a water jet-stream propelled craft with a conventional propeller-driven craft in conducting aids to navigation-type work. Thus, on February 12, 1962, P. O. Chapman, Commanding Officer of the Field Testing and Development Unit at Curtis Bay, Md., was informed that he could expect to shortly receive the Buehler water jet craft and was also told:
8. Upon receipt of the boat and after indoctrination in its use, please carry out standardization trials on the boat as received. * * * After completion of trials as received, remove the pump and replace with a propeller and shaft, temporarily modifying the boat as required to do so. Using a temporary tiller, perform the same trials as above. Determine the performance of the pump propulsion relative to propeller propulsion.
4. Upon receipt of the boat, please determine the diameter of propeller which can be swung, and maximum engine rpm. We will furnish propeller data.
(c) Chapman, on August 13, 1962, reported that in order to carry out the evaluation desired the following work was anticipated:
a. Bemove jet pump unit and drive shaft from the lU-lO" turbo-craft boat.
b. Close all openings left by jet pump removal by making epoxy-glass cloth build up.
c. Manufacture and install a propeller shaft of suitable length and diameter, * * *. Installation to include necessary shaft log, bearing and strut, also engine nalignment [sic]. Provision will have to be made for cooling water for engine since this is presently taken from jet pump.
d. Manufacture and install a rudder and steering mechanism.
2. The above equipment will be in service for a very few days, just long enough for speed and power measurements, after which the original equipment will be reinstalled. * * * [Italic added.]
Captain Chapman testified at trial that all of these in *686 tended alterations were not necessary and that in fact the only temporary modifications made consisted of:
(i) removal of the axial flow pump and jet stream deflector;
(ii) temporary patching of hull openings;
(iii) installation and connection of a Mercruiser II propeller to the existing Chrysler engine; and
(iv) installation of temporary steering control.
(d) On April 5, 1963, Chapman filed his report on the engineering evaluation of the Buehler Turbocraft Propulsion Unit. The report, in addition to establishing that the craft had a maximum velocity of 31 m.p.h., reached the following conclusions:
The Turbocraft, Model 35F plastic boat, powered by a 120 hp Chrysler, six (6) cylinder gasoline engine driving a Buehler 3 stage 7*4 inch diameter axial flow pump is a light weight, trailerable, highly maneuverable runabout.
Operation of the above boat with a Mercruiser II out-drive & propeller in lieu of the jet drive results in comparable maneuverability and generally improved performance at low speeds.
In comparison with the inboard-outboard propeller drive tested, the jet drive is a less efficient means of propulsion as indicated by a lower propulsive coefficient over the full operating range obtainable.
The performance of the jet propelled boat is severly [sic] penalized by added weight.
16. The above-documented events relative to the 18-foot Buehler craft were substantiated by the testimony of Capt. P. O. Chapman. Capt. Chapman recalled the temporary changes for test purposes made to the craft. Capt. Chapman recalled the removal of the craft’s original jet pump and the installation of a conventional Mercruiser outboard propeller mechanism. The testimony also showed that after completion of the tests, and in late 1962, the outboard propeller mechanism was removed and the original jet pump was reinstalled. Capt. Chapman further testified at the trial that the commercially procured Buehler craft was never modified to include an open-center propeller as disclosed in plaintiff’s pat *687 ent. He further testified that the boat was placed bach into its original commercial configuration after the tests were performed and that it was transferred in late 1963 to its operating center in the Second Coast Guard District.
17. The record establishes that the Coast Guard’s only boat building facilities are at its Curtis Bay, Md., Yard. Capt. Chapman testified that at least as late as 1969, when he had occasion to check into the matter as a result of plaintiff’s accusation of patent infringement, the Coast Guard had never built any water jet craft at the Curtis Bay Yard.
18. In addition, Adm. Morrison, Chief Counsel for the U.S. Coast Guard, testified that a search of records at the Curtis Bay Yard failed to uncover any drawings made by Coast Guard engineers for use in the manufacture of open-center-type propellers.
19. As noted above, Capt. Chapman’s testimony was solely directed to the temporary modifications which were made to the 18-foot Buehler craft while it was under evaluation at the Curtis Bay Yard. Further, the parties are in agreement that the 18-foot Buehler craft was, at the time it was shipped out of Curtis Bay, Md., in its original commercial condition.
20. A review of the trial transcript reveals that no Coast Guard records were found to establish that any modification in structure, aside from normal wear-and-tear-type repairs, was made to any of the six hereinabove-identified water jet-stream craft. Mr. Peter Alfred Silvia, the individual having cognizance over design modifications to all boats in the Coast Guard fleet since late 1967, personally did not recall modifying any boats to incorporate an open-center propeller. It was further established that modification of such a nature would require supporting paper work, drawings and authorization from Coast Guard Headquarters, and the supporting paper work and drawings for such a modification would be found in Coast Guard records that are kept by Mr. Silvia’s group. A search of appropriate records failed to uncover authorization or drawings for altering any water jet craft to include an open-center propeller mechanism.
21. (a) Moreover, a review of available records indicates *688 that no modifications of a design nature were ever made to any of tbe six water jet-stream craft while they were used by the Coast Guard. Particularly, a review of the Quarterly Boat Reports for CG-180075 indicates that a considerable amount of work was performed upon it during its Coast Guard service, but all of the work consisted of repairs to or structural replacement of its standard parts. There is no evidence to indicate that its pump unit was ever modified to an open-center propeller of the type shown in Fig. 4 of plaintiff’s patent. Further, there is no testimony or evidence in the record to show that the craft was ever modified by the Coast Guard to include three water intake tubes. There has been no showing that open-center power-operated propellers, sliding door valves, inlet fins, or blade mechanisms, were ever installed at the water inlets on any of the jet-stream boats. In addition, no evidence or testimony was presented to show that the Coast Guard has ever procured, modified or used water jet craft that employ gyroscope-operated hydraulic jacks for controlling the operation of the inlet fins.
(b) The official boat records for Coast Guard craft CG-180075 show that defendant at one time increased the value placed on the hull of the craft by $1,026.33. The reason for the increase is unclear. Furthermore, the testimony of defendant’s witnesses at trial failed to satisfactorily explain the increase.
22. (a) The testimony in the record established that the six hereinabove-identified water jet craft were intended and designed to operate as planing boats, i.e., in a way that as the craft came up to speed their bows projected substantially out of the water. It is, of course, necessary with these types of ships that the water intake ports be in the water at all times, and, with the bottom rearward position of the inlet duct on the commercially procured craft, this is taken into consideration. However, Mr. Silvia testified that a repositioning of the water intake ducts from the bottom of the craft to the bow, stem and sides, as shown in Fig. 2 of plaintiff’s patent drawings, would render the planing craft effectively inoperative.
(b) The testimony further established, and plaintiff *689 agreed, that it is impractical, unnecessary and costly to use gyroscopes on boats of tbe 18-to-22-foot class. The record establishes that the cost of installing a gyroscope on a boat of the 18-to-22-foot class would amount to as much as the original cost of the craft itself. It was further shown that gyroscopes are rarely, if ever, used on craft of the 18-to-22-foot class. Indeed, the testimony of witnesses and Coast Guard records introduced at trial failed to establish their use on any of the six water jet craft hereinabove-identified.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and his petition is therefore dismissed.