OXY METAL INDUSTRIES
CORP., Plaintiff,

v.

ROPER CORPORATION, Defendant.

Civ. A. No. R–79–1805.

United States District Court,
D. Maryland.

Jan. 18, 1984.

---

Don K. Harness, Harness, Dickey & Pierce, Birmingham, Mich., Andrew Jay Graham, Kramon & Graham, P.A., Baltimore, Md., for plaintiff.

John A. Diaz, Morgan, Finnegan, Pine, Foley & Lee, New York City, Joel J. Feinberg, Piper & Marbury, Baltimore, Md., for defendant.

## OPINION

RAMSEY, District Judge.

Oxy Metal Industries Corporation filed this action for infringement of United States Patent No. 3,444,007 on September 27, 1979. The patent in suit relates to a process for coating zinc and zinc alloy surfaces prior to painting. The plaintiff charges that the defendant, Roper Corporation, has infringed this patent, and asks for an injunction against further infringement by Roper and for an accounting of damages arising out of defendant's infringement. Roper denies any infringement, and contends that the '007 patent is both invalid and unenforceable. The case was tried before this Court without a jury. Pursuant to Fed.R.Civ.P. 52(a), the Court makes the following findings of fact and conclusions of law.

## I. *Findings of Fact*

### A. *Introduction*

When the plaintiff filed suit, it was a corporation organized and existing under the laws of the State of California, and had its principal place of business in the State of Michigan. During the course of this litigation, Oxy Metal was merged into Hooker Chemicals & Plastics Corp., a corporation of the State of New York, which on April 1, 1982, changed its corporate name to Occidental Chemical Corporation. For the convenience of the Court and the parties, Occidental Chemical Corporation, the successor corporation, was referred to at trial as "Oxy Metal," and will be designated by its earlier name in this opinion. Defendant Roper is organized and existing under the laws of the State of Delaware, and has its principal place of business in Maryland. The alleged acts of infringement were committed in Maryland.

United States Patent No. 3,444,007 ['007 patent or Maurer patent], entitled "Process of Forming Paint-Base Coatings on Zinc and Zinc Alloy Surfaces," was issued on May 13, 1969, to Oxy Metal, as the assignees of James I. Maurer and Vinod D. Shah. The patent is based upon applications no. 310,877, filed September 23, 1963, and no. 623,513, filed May 13, 1967, and is a "use" patent because it claims the use of a process, a chemical formulation, to reach an end result.

Under the process described in the '007 patent, zinc or zinc alloy surfaces are dipped in or sprayed with an aqueous alkaline solution which contains at least one metal ion and a complexing agent. Zinc ions and the added metal ion or ions form a "complex oxide coating." The complex oxide coating provides good corrosion resistance and a flexible paint base so that the metal can be bent or formed after painting without the paint flaking or chipping off the metal surface along the bent areas.

Prior to the process described in the '007 patent, phosphate coatings commonly were used on galvanized steel prior to painting, but a phosphate coating, because of its crystalline structure and lack of flexibility, was not totally satisfactory as a paint base on galvanized steel that was to be bent or formed after painting. The evidence demonstrates that Oxy Metal's commercial product, "Bonderite 1303" (which is covered by the '007 patent) is superior to phosphate coatings in both bending and formability. Roper itself switched from an acid phosphate coating process (sold by Oxy Metal to Roper as Bonderite 37S) to Oxy Metal's Bonderite 1303. Roper's chemist who oversees metal treatment and painting at the Baltimore, Maryland plant admitted the superiority of Oxy Metal's Bonderite 1303 product over prior phosphate treatments.

Roper used the plaintiff's Bonderite 1303 product before switching in 1979 to the process that Oxy Metal alleges to infringe its patent. From 1964 to March, 1979, Roper purchased Bonderite 1303 materials from Oxy Metal, and used these materials in a method for treating galvanized steel coil stock. During 1972, Roper treated a series of galvanized test panels with a ma-

terial called "Bondcoat," which it obtained from Heatbath Corporation, and treated a corresponding series of test panels with Oxy Metal's Bonderite 1303 material. Roper subjected the panels to Florida outdoor exposure tests for six or seven years. The results of these tests demonstrated to Roper that the treatment material appeared equivalent from a paint adhesion standpoint. In 1979, primarily for cost reasons, Roper decided to buy Heatbath's Bondcoat material to treat its galvanized steel prior to painting instead of Oxy Metal's Bonderite 1303, and has used Bondcoat materials since that time to pretreat its galvanized steel. When Roper changed from Bonderite 1303 material to Bondcoat, it used generally the same sequence of operations for treating galvanized steel with Bondcoat that it had with Bonderite. In 1979, Oxy Metal offered Roper a license under the '007 patent to practice the method covered by the claims set forth in the patent, but Roper declined to accept the offer. Oxy Metal then filed suit on September 27, 1979.[1]

### B. *Infringement*

1. *The Claims*—Oxy Metal's '007 or Maurer patent, which is titled "Process of Forming Paint-Base Coatings on Zinc and Zinc Alloy Surfaces," states six "claims" that delimit the bounds of this use patent. Each claim varies slightly, and describes a process which achieves a specified result. Claims 2–6 incorporate Claim 1. As will be discussed later, unauthorized duplication of any one of these processes as described by the claims would constitute infringement of the patent.

■ Oxy Metal contends that Roper has infringed Claims 4, 5, and 6, and 1, 2, and 3 to the extent that 4, 5, and 6 are dependent

upon 1, 2, and 3. Claim 1 of the '007 patent reads as follows:

> A method for coating zinc and zinc alloy surfaces which comprises contacting said surface with an aqueous alkaline solution having a pH of at least about 11, which solution contains at least one metal ion other than an alkali metal ion selected from the group consisting of silver, magnesium, cadmium, aluminum, tin, titanium, antimony, molybdenum, chromium, cerium, tungsten, manganese, cobalt, ferrous and ferric iron and nickel, and a complexing agent present in said solution in an amount sufficient to hold said other metal ions in said solution and effecting a reaction between said solution and said metal surface to form a complex oxide paint-base coating on the metal surface, said metal ion selected from the indicated group being present in the treating solution in an amount sufficient to produce a coating quality which enables the thus-produced complex oxide coating to function as a base for paint.

In other words, Claim I describes a chemical solution that effects a reaction with the zinc or zinc alloy surface to form a complex oxide coating which "function[s] as a base for paint." This solution must have three ingredients:

(1) An alkaline producing agent. This agent enables the solution to be alkaline and have a pH of at least about 11. The two mentioned in the '007 specification [2] are triethanolamine [TEA] and alkali metal (solium) hydroxides;

(2) One or more of the sixteen heavy metals identified in the body of claim 1; and

This patent relates to a composition and method very similar to that described in the '007 patent.

---

1. Heatbath Corporation, Roper's current supplier, has agreed to defend and hold Roper harmless from any and all claims or damages for patent infringement of the '007 patent, arising out of or resulting from Roper's use of Bondcoat. Heatbath has been aware of the '007 patent since at least 1969, and is the owner of U.S. Patent No. 3,929,514, granted December 30, 1975 for "Composition and Method for Forming a Protective Coating on a Zinc Metal Surface".

2. The "specification," as will be discussed later, is not part of the claim but amplifies upon it. *See Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871 (1917).

(3) A complexing agent,[3] which serves to keep the heavy metal ions in solution. The specification lists hundreds of compounds that can serve as the complexing agent.

Claims 2–6, inclusive, expand upon Claim 1:

2. The method as claimed in Claim 1 wherein the aqueous alkaline solution contains at least one alkali metal ion.

3. The method as claimed in Claim 2 wherein said other metal ion, other than an alkali metal ion, is present in an amount of at least 0.002% by weight per unit volume.

4. The method as claimed in Claim 2 wherein said other metal ion is iron.

5. The method as claimed in Claim 3 wherein said other metal ion is a plurality of ions and includes cobalt.

6. The method as claimed in Claim 3 wherein said other metal ion is a plurality of ions and includes iron.

2. *The Bondcoat Process*—Oxy Metal alleges that Roper merely has substituted Heatbath's Bondcoat chemicals for the patented Bonderite 1303 chemicals. Roper, however, contends that its Bondcoat process varies from the Bonderite process it used prior to 1979. Accordingly, the current Roper process must be examined closely to determine whether all or part of the '007 patent claims are mirrored in the Bondcoat process. There is little dispute between the parties as to what is involved in the Roper process. They disagree strongly, however, about the characterization of various stages of the process.

The Bondcoat materials supplied by Heatbath Corporation to Roper are in the form of concentrates. The Bondcoat bath is prepared by adding about 90% by volume water to about 10% by volume of Bondcoat concentrate. Bondcoat contains sodium hydroxide, triethanolamine [TEA], cobalt nitrate, ferric nitrate, and water. Oxy Metal contends that the TEA functions not only as an alkaline producing agent, but also as a complexing agent designed to maintain the cobalt and iron ions in solution.

The steel passes first through an alkaline cleaning bath to remove oils and extraneous substances and then through a spray water rinse to remove the residual cleaner. Next, if the steel has been supplied to Roper as hot dipped galvanized steel, it passes through an electroplating section with the current turned off so that no further galvanization occurs, but if the steel supplied to Roper has not been previously galvanized, it passes through the electroplating section with the current turned on to electrodeposit a zinc plating.[4] In either case, after the galvanized steel passes through the electroplating section, it is again water rinsed. Both the hot dipped galvanized steel and the steel electrogalvanized then enter a bath containing the Bondcoat material. Bondcoat is added on a continuous basis by Roper to the operating bath to maintain the bath's strength. For example, when the alkalinity of the Bondcoat bath is not in the proper range, more Bondcoat is added.

After passing through the Bondcoat bath, the galvanized steel is spray water rinsed once more. After this rinse, it passes first through a "Phoseal bath (which is an acid bath containing chromate at a temperature of about 110 to 130 degrees),

---

**3.** Plaintiff admitted the following definition at the request of defendant:

Complexing agent/chelating agent/sequestering agent (sequestrant)—There are minor distinctions between these terms not relevant here; as used in the patent in suit these terms are interchangeable. Complexers, etc., chemically attach to an ion in solution (such as ferric ion, a form of ion) to facilitate keeping it in solution.

Solution, in turn, is defined as "... a combination of a solvent such as water and completely dissolved solids."

If the complexing agent is not present in sufficient quantity, the metal ions will not be held in solution, but will precipitate out of the solution.

**4.** *As will be discussed later, the plaintiff's experts performed tests on hot dipped galvanized steel, not electroplated steel. The defendant contends that those tests, therefore, are irrelevant. The Court finds, however, that once the steel has a zinc or zinc alloy surface, it does not matter for the purposes of the Roper process whether the steel is HDG or electroplated.*

and then through a set of squeegee rolls. "Phoseal," a post-treatment product, is a chromic acid rinse sold by Heatbath. When Roper changed from Oxy Metal's Bonderite 1303 to Heatbath's Bondcoat, it also switched from Oxy Metal's "Parcolene 60" chromic acid rinse to Heatbath's rinse. After the steel dries, a paint coater applies either one coat or two coats of paint.

3. *The Alleged Infringement* —Oxy Metal alleges that Roper has infringed and continues to infringe Claims 4, 5, and 6 of the '007 patent, and Claims 1, 2, and 3 to the extent that they are necessary to establish infringement of Claims 4, 5, and 6. With regard to Claim 1—the primary claim in dispute—Roper denies that Bondcoat (1) contains a complexing agent, (2) forms a complex oxide coating, and (3) is a solution when mixed with water. Roper also contends that its process does not infringe upon Claim 1 because of additional steps in its process. Both plaintiff and defendant agree, however that Bondcoat contains two alkaline producing agents, triethanolamine [TEA] and alkalimetal (sodium) hydroxide, and two heavy metal ions that are listed in Claim 1, cobalt and ferric iron. The defendant also admits that the aqueous alkaline solution that contacts the zinc or zinc alloy surface has a pH of at least about 11. Roper's defense on independent Claims 4, 5, and 6 rests primarily upon the assertions regarding dependent Claim 1. In addition, the defendant contends that if a complex oxide coating exists, it. does not include cobalt as required in Claim 5.

The plaintiff and defendant each presented expert opinion on the infringement issue. Numerous exhibits were also introduced. Oxy Metal had two experts who discussed Roper's alleged infringement of the '007 patent: Charles Wendel and David Hercules. Charles A. Wendel, Esquire, a patent lawyer, testified as a patent expert. Plaintiff's primary expert witness, Professor David M. Hercules, Chairman and Professor of Chemistry at the University of Pittsburgh, testified as to the evaluation of the coating produced on galvanized test panels

treated with Bondcoat and analysis of metal surfaces. Two others also testified for the plaintiff: Walter Cavanagh, the former manager of Oxy Metal's Technical Services Department, testified as to the chemical analyses of Bondcoat bath samples taken at Roper's plant. Dr. Jack A. Kramer, an employee of Oxy Metal with a PhD from the University of Illinois in inorganic chemistry, testified as to the test procedure for preparing galvanized test panels treated with Bondcoat material and the chemistry of metal treatment. Roper had two expert witnesses on the subject of infringement: Alan Wolf and George Jernstedt. Alan K. Wolf, General Manager of Massachusetts Materials Research, Inc., testified regarding photomicrographs and the non-existence of coatings on zinc metals treated with Bondcoat. George W. Jernstedt, who has extensive experience in metal finishing art, analyzed the Bondcoat process. William C. Jones, an employee of Heatbath, also testified. He discussed the non-existence of coatings and cobalt on zinc metals treated with Bondcoat. Dr. Mary V. Zeller, who was listed as defendant's expert in the pretrial order, failed to appear.

The Court finds Roper's denial that the triethanolamine [TEA] in the Bondcoat material serves as a complexing agent,[5] or that Bondcoat contains any agent designed to hold ions in solution unpersuasive. As previously discussed, Claim 1 of the '007 patent, requires "a complexing agent present in said solution in an amount sufficient to hold said other metal ions in said solution ...." The specification (which is not part of the claim) lists hundreds of compounds that can serve as the complexing agent. TEA is not on this list. The testimony of Roper and Oxy Metal witnesses (as well as several prior publications introduced into evidence), however, demonstrate that TEA is a well-known complexing agent. Even Heatbath's Research Director William Jones, stated that the TEA in the Bondcoat materials holds the heavy

5. *See supra* n. 3. Roper, however, admits that TEA is an alkaline producing agent.

metal ions (iron or cobalt) in solution.[6] Tests performed by the plaintiff's witness, Dr. Kramer, established to this Court's satisfaction that enough complexing agent was present in the tested Bondcoat solution to hold the iron and cobalt ions in solution, rather than in suspension. The absence of TEA from the specification's list of complexing agents does not necessarily mean that TEA is not such an agent.[7] Roper's contention that Bondcoat does not contain a "complexing agent" is contrary to the testimony and other evidence in this case.

Oxy Metal also successfully countered Roper's contention that the Bondcoat formulation leaves no "complex oxide coating" on the treated surfaces as required by Claim 1 and, in turn, the dependent Claims. The defendant's arguments that no complex oxide exists and that its process "etches," not "coats," the zinc or zinc alloy surface was not supported at trial. The record demonstrates that Roper's Bondcoat aqueous alkaline solution effects a reaction between the solution and the zinc or zinc alloy surface of galvanized steel to form a complex oxide coating on the metal surface.[8]

Every witness who addressed this issue observed some type of reaction between the solution and the metal surface. Both Dr. Kramer and William Jones stated that a reaction results in the formation of a conversion coating. Ike Newell testified that the interaction of the base metal with the bath forms a deposit which may include part of the base. The exhibits and testimony showed that panels treated with Bondcoat material change color and that, if the coated surface is scratched, the coating can be penetrated and base metal seen below the scratch mark.

Roper's supplier, Heatbath, in a letter from its General Sales Manager, Peter Petroff, to John Walsh at Roper, described its Bondcoat material as providing a "complex metal oxide coating consisting primarily of zinc oxide interspersed with lesser amounts of ferric and cobaltic oxides." It is significant that this definition by Heatbath's salesman is remarkably similar to the definition given by Maurer, the inventor of the '007 Patent.[9] At trial, defendant's witness, William Jones, claimed that Petroff's definition was wrong, but no one explained why Petroff described the coating in this manner.[10] Trial counsel for Roper indi-

---

**6.** At trial, plaintiff's counsel asked Jones, "So that is the function then of the triethanolamine to prevent the separation and precipitation out of the iron and cobalt in the Bondcoat solution, isn't that correct? He answered, "It is one of the functions," Tr.Vol. II, p. 26.

**7.** Contrary to the defendant's contentions, Maurer's unfamiliarity with TEA as a complexing agent is inconsequential scientifically and, as will be discussed later, is no bar to concluding that the defendant infringed the '007 patent. In this vein, the Court notes that the defendant's findings of fact are often interspersed with legal, not scientific, conclusions.

**8.** Although some of defendant's criticisms of the plaintiff's tests (such as Jernstedt's observation that scratching a Bondcoat treated panel with a nail clipper to expose a different color "has no bearing on what the surface is," see Tr.Vol. IV, pp. 156–57) may be correct, the Court found this nitpicking unpersuasive.

**9.** See supra at pp. 667–668.

**10.** At trial, the Court questioned Mr. Jones about the Petroff letter:

THE COURT: Where in the world would he have gotten this statement? Your research people must have given him something to base it on. He is not going to write advising of results of a chemical process without finding out from somebody what it's doing, is he? If you send a sales letter out—he isn't going to send a letter out and say our process is going to do so and so if he doesn't known what it will do. He's going to ask research, isn't he? THE WITNESS: The only thing I can say is he wrote this letter and I would interpret it as salesman's puff or something of that sort. BY THE COURT: How does that puff anything, to tell him you have a complex oxide form? That is not a sales gimmick. What is that going to sell anybody on? Why wouldn't he have come to somebody in research and said is this an accurate representation I am making to a customer? THE WITNESS: In point of fact he didn't. THE COURT: He did? THE WITNESS: He did not. THE COURT: All right. Is he a chemist, by any chance, Petroff? THE WITNESS: No, sir. THE COURT: A remarkably agile sales manager, if he is prepared to vouch for your

cated that Petroff would appear later in the trial to explain away his statement, but he never testified. In addition, the Heatbath patent upon which the Roper process is based talks about the formation of a complex oxide coating and that such a coating may be used as a base for paint.

At trial, plaintiff's expert, Dr. Hercules, who is the chairman of the Department of Chemistry at the University of Pittsburgh and was represented by the plaintiff to be a leading expert on surface analysis techniques, testified concerning the tests he had conducted for Oxy Metal. His testimony was persuasive. Dr. Hercules found that as a result of treating Roper's galvanized steel panels with Bondcoat material supplied to Oxy Metal by Roper a reaction had been effected between the treating solution and the metal surface, and that a complex oxide coating had been formed. He relied upon several analytical methods in carrying out his work which he explained during the trial: namely, the Auger, ESCA, SIMS, and LAMMA tests. The Auger and ESCA tests confirmed the presence of a complex oxide coating on all treated panels. The SIMS and LAMMA tests confirmed the presence of iron and cobalt on all of the surfaces of the treated panels. Dr. Hercules also testified that when a zinc surface is contacted by an alkaline solution, a chemical reaction should occur which causes an oxide to form on the surfaces, and that all metals oxidize when subjected to the atmosphere or an alkaline solution. He concluded that the cobalt and iron in the coating are in the form of oxides and that it would be contrary to all laws of chemistry to have iron or cobalt present on the treated metal in anything but an oxide form.[11]

Mr. Alan Wolff, Roper's witness at trial on complex oxide coating testified that he disagreed with "nothing specific" that Hercules said, but opined that a coating was not formed. His opinion was founded upon scanning electron microscope and X-ray fluorescence (SEM and SEM/EDX) analysis techniques. Wolff agreed, however, with Dr. Hercules' comments during trial that these techniques had shortcomings. In this regard, Mr. Wolff agreed that in the SEM/EDX tests he had used the significantly greater amount of iron on the test panels could mask out any cobalt present on the panels. The Court finds that this undermines Wolff's contention that no complex oxide coating exists. It is incorrect to state, as the defendant contends, that his SEM photographs, which found no cobalt or iron, stand "uncontested."

In the pretrial order, Roper had indicated that it intended to use Dr. Mary V. Zeller as an expert witness to discredit the tests of Dr. Hercules and Dr. Kramer, but Dr. Zeller never testified. During the course of trial Oxy Metal introduced as an exhibit an article co-authored by Dr. Zeller which stated that scanning electron microscopy with associated x-ray emission spectrometry (a test procedure of the type used by Mr. Wolff) was "hardly an important surface analytical technique."[12] Zeller's article tends to confirm Dr. Hercules' criticism of the type of tests used by Mr. Wolff.

At the trial, Roper criticized the tests conducted by Dr. Hercules and Dr. Kramer and their conclusions for several reasons, but each criticism was explained adequately or was rebutted successfully by Oxy Metal. For example, Roper contended that its process etches the galvanized steel surfaces rather than coats them. The testimony from Oxy Metal's witnesses and the exhibits in this case convince this Court that the Roper process effects a reaction that yields a complex oxide coating. In addition, defendant's own experts did not prove the etching theory. As discussed

chemical processes in a letter to your customers. All right, go ahead, Mr. Diaz.
MR. DIAZ: Yes, we will be calling Mr. Petroff and the Court may address those questions to him.

**11.** These oxides constitute the complex oxide required in Claim 1. The defendant's argument

that no complex oxide exists as a result of the Roper process, in essence, is an argument that no iron oxides and cobalt oxides exist. *See, e.g.,* Tr.Vol. III, p. 64.

**12.** *Zeller, et al., Surface Analysis of Particles Emitted to the Atmosphere,* at 128 (1980).

above, Jones of Heatbath testified that etching does not preclude the formation of a coating and admit that etching is a prerequisite for the formation of a conversion coating and that a weight loss due to etching does not mean that there is no coating on the base metal. Even Mr. Wolff who testified on behalf of Roper stated that there can be a film or coating on an etched or pitted surface. The SEM microphotographs, which showed some etching, did not overcome the firm convictions of plaintiff's expert witnesses and the gaps in the testimony by defendant's experts. Roper also criticized Oxy Metal's use of test panels treated only with Bondcoat, rather than with both Bondcoat plus Phoseal, as is used in actual production at Roper. Oxy Metal, however, specifically set up its test program so as to avoid any possible effect of the subsequent chromic acid rinse on the subject Bondcoat coating. Dr. Hercules testified that this was the scientifically sound way of analyzing only the Bondcoat coating without adding the extra variables possible after a chromic acid rinse.[13] Roper strongly criticized the Bondcoat treatment times chosen by Dr. Kramer for use in preparing the test panels for Dr. Hercules' tests, arguing that Kramer's tests were irrelevant because of treatment times which varied from those in the Roper process. Roper's expert, Walsh, however, testified that the immersion time used does not affect the pretreatment. In addition, some of the treatment times used by Kramer were within the treatment time range used by Roper.

Lastly, Roper criticized Oxy Metal's spraying Bondcoat solution on the test panels rather than using the immersion technique as done in Roper's plant. Plaintiff's witness, Dr. Kramer, countered this argument. He testified that based on scientific literature, laboratory spraying more closely simulated the commercial Roper process

where the galvanized steel moves through the Bondcoat solution at speeds averaging 200–300 feet per minute than would laboratory immersion in which test panels are dipped into a beaker.

The third contention with regard to Claim 1 that this Court must examine is that the Bondcoat material when added to water is in suspension, not in solution. This argument is the corollary of Roper's proposition that the Bondcoat material does not contain a complexing agent. Neither argument has merit. As discussed previously, Bondcoat contains triethanolamine which operates as a complexing agent. Tests performed by Dr. Kramer demonstrated that enough TEA was present in the tested Bondcoat solution to hold the iron and cobalt ions in solution, rather than in suspension. The Court makes the finding despite evidence of small amounts of precipitate in "aged" Bondcoat.

Roper argued during the trial that it does not infringe upon Claim 1 because it does not paint over galvanized steel that has been treated solely with Bondcoat, but instead paints over steel that has been rinsed with Phoseal chrome rinse. Claim 1 states only that the complex oxide coating is a base for paint. It does not discuss the advisability of a final chromic acid rinse. The specification of the '007 patent, however, states that the complete process of the invention also includes a subsequent dilute aqueous chromic acid rinse. According to Jones, Heatbath's research director, this rinse removes the last traces of alkalinity on the metal surface which would be undesirable for subsequent painting. Thus, Roper's chromic acid rinse material does not form a film on the galvanized steel surface, but is an additional pre-painting preparation.

Roper's argument that the complex oxide coating, if one exists, does not contain any cobalt as required in Claim 5 is not sup-

---

**13.** Even though Oxy Metal originally requested from Roper actual galvanized steel strip stock from Roper's plant which had been treated with only Bondcoat solution, Roper never complied. The defendant advised the plaintiff that it was not practical to do this because it would be very difficult to stop its production line and obtain galvanized steel that had only been treated by Bondcoat and had not had the subsequent Phoseal chrome rinse treatment. The Court finds that the tests on non-Roper steel are relevant in evaluating the defendant's process.

ported by its own witnesses and was refuted by the plaintiff. The cobalt reading on one panel below the generally accepted detection limit of the instrument in the direct aspiration test is not critical, and is overcome by Dr. Kramer's other readings and tests. The defendant's criticisms of his testing techniques, such as the varying spray times or the running of tests on hot dip galvanized steel, are not persuasive to this Court. Dr. Hercules' SIMS and LAM-MA tests confirmed the presence of iron and cobalt on Bondcoat-treated surfaces. As discussed previously, the tests relied upon by the defendant's expert, Alan Wolff, are unreliable to ascertain whether these elements are present.

Roper's process also duplicates Claims 2 and 3. As required by Claim 2, upon which Claims 3 and 4 depend, the aqueous alkaline solution contains at least one alkali metal ion. As required by Claim 3, upon which Claims 4, 5, and 6 depend, the metal ion contained in the Bondcoat treating solution used by Roper is present in the solution in an amount of at least 0.002% by weight per unit volume.

This Court finds that the plaintiff showed evidence that the accused Roper method has all of the elements required by Claims 4, 5, and 6 of the '007 patent in suit. The solution used by Roper in its accused method contains at least one metal ion other than an alkali metal ion. The "alkali metal ion" is provided by sodium hydroxide (sodium ions). The "metal ion other than an alkali metal ion" is provided by either ferric nitrate (which provides iron ions) or cobalt nitrate (which provides cobalt ions), both of which are present in the Bondcoat materials supplied by Heatbath Corporation to Roper. The limitation of Claim 4 of the '007 Patent in suit that "said other metal ion is iron" is met by the accused Roper method. The limitation in Claim 5

that "said other metal ion is a plurality of ions and includes cobalt" is also met by the Roper method.

Finally, the limitation in Claim 6 of the '007 patent in suit that "said other metal ion is a plurality of ions and includes iron" is met by the accused Roper method.

C. *Validity*

As a defense to Oxy Metal's charge that Roper infringed its '007 patent, Roper contends that Claims 4, 5, and 6 are not "valid" for three reasons: First, the patent office did not consider pertinent "prior art" which would have rendered Maurer's invention "obvious." Second, Bonderite 1303, which is Oxy Metal's patented product, was sold to and used by the public before the patent was granted. Third, the patent is "indefinite." The Court does not accept any of these contentions.

1. *Obviousness* —As will be discussed later, differences between the invention which is sought to be patented and the prior art in the field must be such that the invention is not obvious to a person having ordinary skill in the art.[14] If the invention is merely an obvious improvement, it is not patentable. Roper contends that the patent office failed to consider most pertinent prior art—the Elliott Patent No. 2,975,039, the Elliott Patent No. 2,975,040, the Prier Patent No. 1,923,502—and that these patents and the Lum Canadian Patent No. 473,024[15] rendered the invention patented by Oxy Metal obvious to one having ordinary skill in the art to which the '007 patent pertains. After reviewing the '007 patent, the four prior art patents relied upon by Roper, and Roper's interpretation, this Court finds, and will later conclude, that none of the prior art relied on by Roper discloses or teaches the '007 patent method of treating zinc or zinc alloy surfaces.[16]

14. See 35 U.S. § 103. *See infra* pp. 679–680.

15. The Court is not swayed by the defendant's contention that the plaintiff "mischaracterized and misrepresented" the teachings of the Lum 024 patent to the patent office.

16. The extensive recitation of "teachings" in the defendant's proposed findings of facts does not fairly state the relation of the patent in suit to the four prior art patents. *See* Defendant's Post Trial Proposed Findings of Fact and Conclusions of Law, at 15–20.

Roper's expert, Jernstedt, testified that all of the elements recited in the '007 Patent Claims 4, 5, and 6 are disclosed in four prior art patents. He testified, however, that he considered himself to be one of greater than ordinary skill in metal finishing art, the art to which the subject matter of the '007 patent pertains. A person of ordinary skill, according to this witness, would have a B.S. in chemistry and two or three years of laboratory experience. Jernstedt, who holds many patents in this field, including seven patents (introduced by Oxy at trial) which relate to technology pertaining to phosphate coating of galvanized steel before painting, testified that he knew Lum and worked with him at Westinghouse Corporation, and was familiar with Lum's patented process as described in Lum's Canadian patent. Jernstedt further testified that he had made up solutions as described in the two Elliott Patents, No. 2,975,039 and No. 2,975,040, relied on by Roper as prior art, and that he had studied the fourth patent relied on by Roper as prior art, namely Prier Patent No. 1,923,-502. He did not, however, use this knowledge and experience to reach the same conclusions later made by Maurer.

With regard to the four patents relied upon by Roper as prior art in its effort to invalidate Claims 4, 5, and 6, of the '007 patent here in suit the Court finds the following differences between this prior art and the patent in suit.

(a) Canadian Patent No. 473,024 to Lum:

This patent relates to the art of producing corrosion resistant phosphate coatings on the surfaces of metal and teaches an activation treatment of the type described in the seven prior art Jernstedt patents referred to above which is used prior to a phosphate treatment and which treatment has been known since the 1940's. It is this type of treatment coating that Walsh testified would crack under paint when the painted galvanized steel was bent and that was replaced by the treatment process of the patent in suit. There is no teaching in the Lum patent that one could paint over the activation treated surface without first applying a phosphate coating. Furthermore, it is necessary in the Lum process to have colloidal metal particles in suspension or otherwise activation will not occur. This is unlike Oxy Metal's invention wherein the metal ions are and must be in solution.

(b) U.S. Patent No. 2,975,039 to Elliott, and

(c) U.S. Patent No. 2,975,040 to Elliott:

Both Elliott patents teach a rapid chemical etching or milling process for aluminum which is used in place of machining an aluminum part to reduce the weight of the part. The Court finds that one of ordinary skill in the art would not have been apt to look to etching or milling processes for a solution to a paint-base coating problem. Neither of the Elliott patents gives any indication of the pH used. Neither of these patents teaches the need for nor the use of any complexing agent in an amount sufficient to hold metal ions in solution as required by the '007 claims, but merely refer to the use of a sorbitol additive to prevent or reduce scale formation that normally accompanies aluminum etching. The Elliott patents refer neither to zinc or zinc alloy surfaces, nor to a method of providing a paint-base coating as do the patent claims in suit. While Roper's expert, Jernstedt, testified that although he made up a sample of the Elliott etching bath to determine the pH of the bath, he never tried this bath to see if it could be used in place of Bondcoat for the same purpose even though he also testified that one could not tell whether a complexing agent would work until it was tested.

(d) U.S. Patent No. 1,923,502 to Prier:

This patent is an incomplete teaching of a process for protecting metal by the use of a phosphate in the treating solution. The use of a phosphate, however, is not essential in Oxy Metal's patented process. From reading this Prier patent one cannot tell what the pH of the metal treating composition is, or whether the alumina eliminating materials disclosed are com-

plexing agents. In addition, Roper's expert, Jernstedt, did not make up or test any of the Prier patent compositions.

In regard to the prior art argument, the Court notes: No one prior to the '007 patent inventors developed a pre-painting treatment method for galvanizing steel which provided improved results over the prior phosphate coating treatments. The '007 patented method is widely used and has enjoyed great commercial success for many years. Roper's expert, Jernstedt, and others, including Lum, working at Westinghouse Corporation in the field of protective metal coating from 1941 on, never developed this improved metal coating process of the type disclosed and claimed in the '007 patent.

2. *Public Sale or Use* —The patent claims in suit were supported fully by the disclosure in the patent in suit filed in the United States Patent Office on September 23, 1963,[17] and there was no sale or offer for sale or public use more than one year prior to September 23, 1963 of the subject matter of said patent claims. Bonderite 1303 did not become available until January, 1964.

3. *Indefiniteness* —The term "complex oxide," which was coined by Maurer, is not so indefinite as to fail to warn others of the limits of the patented invention. The Court rejects Roper's contention that the term "complex oxide coating" used in the patent claims in suit renders the patent in suit indefinite. Testimony by both the plaintiff's and defendant's witnesses support this conclusion. For example, Heatbath's chief chemist, Brumer, said that he understood the '007 patent, as well as the testimony of Hercules, Maurer, and Newell to the effect that such a coating is made up of more than one oxide although the exact form of the oxides may not be precisely known and a readily definable formula may not exist.[18] Jernstedt testified that oxide coating made up of more than one oxide would be a complex oxide coating if one

could not discern what form the oxides were in. In the case of the '007 patent in suit the coating is a mixture of oxides including zinc oxide and oxides of whatever heavy metals, such as cobalt or iron, that are in the bath. The Court also notes that Heatbath's patent and sales correspondence pertaining to its Bondcoat material use the term "complex oxide coating." In addition, a report on the Proceedings of the Galvanizers Committee used the term "complex oxide" in referring to treating a galvanized surface. The patent claims in suit, namely, Claims 4, 5, and 6 of the '007 patent, are not indefinite, especially when read in light of the patent specification.

4. *Commercial Success* —In regard to the issue of validity, the Court also finds that the plaintiff's patented treatment, Bonderite 1303, was a commercial success. The defendant's argument that the process described in the '007 patent is not a commercial success because it is used in unison with two other patented processes, a post-treatment chromic acid rinse and a sludge-preventive agent, is not persuasive. The evidence shows that Oxy Metal has sold its patented process to the defendant and others, thereby seizing a large share of the market, and that it was a significant improvement over prior zinc surface pre-painting processes.

### D. *Fraud*

■ This Court finds that Oxy Metal's failure to disclose three patents and to provide the patent examiner with certain test data was not a fraudulent attempt to deceive the patent office. The undisclosed art and test data were not material to the patent office's decision, and assuming that the information was material, Oxy Metal did not realize its materiality between 1963 and 1968. The failure to disclose the three patents in question and the test data was

---

17. The Court makes this finding despite the "complex oxide" dispute between the plaintiff and the patent office between September, 1963 and July, 1966. The "effective filing date" is not July 5, 1966, as the defendant contends.

18. Dr. Hercules' testimony concerning the possible interpretations of the phrase "complex oxide" does not alter this finding.

not the result of either deliberate or reckless behavior.

1. *History of Patent Application Prosecution* —During the prosecution of the '007 patent, the patent examiner initially rejected the claims over the prior art Canadian Lum 024 patent. To overcome this prior art rejection three separate Rule 132 Affidavits and at least as many separate arguments were presented to the examiner to convince him of the process' patentability. These efforts ultimately led to the issuance of the '007 patent.

The affidavits and arguments had two purposes: (1) to show that the '007 process was better than the Lum 024 process,[19] and (ii) to show that the metal treating compositions described in the prior art Lum patent are suspensions and do not contain the titanium ions in solution.[20]

The first affidavit which addressed the Canadian Lum '024 patent was prepared by Carolin and was submitted on November 7, 1966, but did not overcome the examiner's rejections based on the Lum prior art patent. On April 19, 1968, Dr. Peter F. King was assigned by inventor Maurer "to prove the inapplicability of the Canadian [Lum] Patent ...." In the following months, King carried out three experimental trials to compare the Canadian Lum patent with the '007 patent. The first trial did not prove the inapplicability of the Canadian Lum patent. As reported by King and Maurer to their management but not the Patent Office, "[t]he first trial show[ed] no advantage to Bonderite 1303 ...."

Dissatisfied with the results of his first trial, King ran a second trial which "was arranged with a wide range of conditions." In his first affidavit, which was filed on July 9, 1968, Dr. King reported approximately twenty out of a total of about 300 items of comparative data collected by him in his first and second trials. The withheld

data generally showed little difference between the performance of the Lum process and the Maurer process.[21]

After the first King affidavit was filed on July 9, 1968, the patent examiner indicated on July 29, 1968 that dependent Claims 4–6 of the Mauer patent application were allowable. The examiner, however, was not convinced by the first King affidavit as to the broader claims, such as Claims 1–3 as they appear in the '007 patent, and in his action of July 29, 1968, requested additional side-by-side comparison tests of the '007 bath and the prior art Lum bath.

King then carried out his third trial, and submitted a second affidavit on September 27, 1968. In this affidavit, King reported only eight out of about 114 items of comparative data which were collected in this third trial. Again, the withheld comparative data showed that the Lum process was comparable to the Maurer process in those areas. After receiving the second King affidavit, the examiner in his action of October 18, 1968, allowed Claims 1–3 as they appear in the '007 patent.

2. *Discussion*—Roper focuses on three patents and two categories of data that were not disclosed to the patent examiner during Maurer's attempt to distinguish his process from the prior art Lum Canadian '024 process: (1) similarity in performance by the two processes in various tests, and (2) the existence of titanium in solution (as opposed to being in suspension) in the Lum material. Neither of the defendant's arguments is persuasive. The effect that the disclosure of the two Elliot patents and the Prier patent would have had has already been discussed.

The failure to disclose all tests evaluating the ability of the two processes to perform as a base coating for paint was not for the purpose of misleading the patent

---

**19.** *See* paragraph 3 of the first and of the second "King affidavits."

**20.** *See* paragraph 1 of the first and of the second "King affidavits."

**21.** Roper stresses the difficulties that King had with his first affidavit. An entry in his note-

book dated the same day as this affidavit stated: "I spent most of the day struggling with PN 317 affidavit." The Court does not infer the mischievous meaning that Roper draws from this quote.

examiner and this information would not have prevented the approval actions of July 29, 1968, and October 18, 1968. The salt spray, knife adhesion, forability deformation, and adhesion tests that were not disclosed were not as significant as the tests that were disclosed. Oxy Metal's chemists ran accelerated comparative tests between galvanized steel panels treated with the Maurer solution versus panels treated with material disclosed in the Lum prior art Canadian patent, all of which were subsequently painted. Two types of paint were used, namely, Dupont's Dulux 707 paint and a Bone White Vinyl paint. Maurer testified that because Oxy Metal's products are used as a paint base treatment on metal surfaces where both strong and weak paints are used, it had been Oxy's practice when it was attempting to determine the relative merits of different paint base metal treatments to use relatively weakly painted metal in its tests to determine whether the treatment would be commercially useful and successful. Comparative tests between galvanized metal panels treated with the different pre-paint materials and then painted with Dulux 707 paint were more meaningful vis-a-vis predicting commercial acceptability than tests where the stronger or better Bone White Vinyl paint was used. It was this latter group that was not disclosed as much as Roper would have required.

Roper's expert, Jernstedt, admitted that if all of Oxy Metal's test data on Dulux 707 painted panels which were treated with Bonderite 1303 were compared with all of Oxy Metal's test data on Dulux 707 painted panels which were treated with the Lum Canadian prior art patent material, almost every single test showed that Bonderite 1303 was better than the Lum material. Although Oxy Metal did not tell the Patent Office that when Bone White Vinyl paint was used on galvanized steel panels previously treated with Bonderite 1303 and with the Lum Canadian patent material, there was little or no difference in the accelerated test results, the affidavits filed by Oxy Metal did not mislead the patent examiner. Roper is incorrect when it contends that

"had the unreported comparative data ... been submitted, plaintiff could not have ... [claimed] that the '007 process was better than the Lum process."

The failure to report to the patent examiner that one filtration test conducted by Oxy Metal on the Lum material showed the presence of .0002% titanium in the Lum material after filtration—thus indicating that some titanium in the Lum material was in solution—is also inconsequential. All of the other filtration tests run by two Oxy Metal chemists showed a zero percentage of titanium in the Lum material after filtration. The presence of .0002% titanium is so small as to be negligible and even Roper's counsel in cross-examination pointed out that, following the "significant figure" practice, numbers should be rounded out to the nearest significant figure. Thus, it would follow that a number such as .0002% could be rounded out to .000%.

The Court finds that King did not intend to mislead the patent examiner when he said that the metal treating compositions described in the Canadian Lum '024 patent "do not contain the titanium ions in solution," and that the patent examiner would have reached the same result had he known this information. The Court makes this finding despite Roper's emphasis upon the highlighting of certain undisclosed data by an unknown Oxy Metal employee in company reports and Jernstedt's testimony.

In addition, this Court rejects Roper's argument that the patent is unenforceable because of the plaintiff's failure to report (in regard to the complex oxide coating) that the term "complex oxide" was coined after the application was filed, that the term does not have a precise definition, that the term did not appear until late in the application process, that the term was created to clarify the uncertainty in the original application, and that Oxy Metal was unsure of the exact composition of the complex oxide coating. This argument not only is based upon incorrect statements of fact, but also misses the gist of the enforceability defense. For example, it is ridiculous to chide Oxy Metal for failing to

inform the patent examiner that the "expression 'complex oxide' was used to clarify the distinction of the Maurer, et al application from a prior art patent cited by the Patent Office ...."[22]

## II. Conclusions of Law

### A. Introduction

Jurisdiction exists under 28 U.S.C. § 1338, and is appropriate in this Court under 28 U.S.C. § 1400(b).

 This Court shall follow the precedent established by the United States Court of Appeals for the Federal Circuit and the old Court of Custom and Patent Appeals and Court of Claims when precedent in these courts is available. Otherwise, this Court will follow the case law from other courts that this Court believes that the United States Court of Appeals for the Federal Circuit would consider persuasive. Under 28 U.S.C. § 1295(a)(1), "[t]he United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction ... of an appeal from a final decision of a district court of the United States ... if the jurisdiction of that court was based, in whole or in part, on section 1338 ...."[23] In the first appeal heard by this new appellate court, it adopted "[t]hat body of law represented by the holdings of the Court of Claims and the Court of Customs and Patent Appeals announced before the close of business on September 30, 1982" as precedent. South Corp. v. United States, 690 F.2d 1368, 1370 (Fed.Cir.1982). It is to this body of law that this Court primarily must look for guidance.[24]

### B. Infringement

The process used by defendant Roper to prepare its galvanized coil stock for painting infringes plaintiff Oxy Metal's Patent No. 3,444,007. Oxy Metal has shown by a preponderance of the evidence that its contentions that the Roper process parallels the process described by Claims 4, 5, and 6 of the '007 patent, and that Roper had no license or lawful right to do so, are correct.

 Under 35 U.S.C. § 271(a), "whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefore, infringes the patent." This Court must examine whether Roper's process falls within the language of the patent claims in determining whether its process infringes the '007 patent. Strumskis v. United States, 474 F.2d 623, 627, 200 Ct.Cl. 668, cert. denied, 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 472 (1973), rehearing denied, 414 U.S. 1147, 94 S.Ct. 902, 39 L.Ed.2d 103 (1974); see Motion Picture Patents Co. v. Universal Firm Mfg. Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871 (1917) (claims to be read in light of the specifications). A patent for a process or use patent, such as the '007 patent, is not infringed unless all of the steps of the process are used. Engelhard Industries, Inc. v. Research Instrumental Corp., 324 F.2d 347, 351 (9th Cir.1963), cert. denied, 377 U.S. 923, 84 S.Ct. 1220, 12 L.Ed.2d 215 (1964); Acme Steel Co. v. Eastern Venetian Blind Co., 130 F.Supp. 459, 466 (D.Md.), aff'd, 227 F.2d 914 (4th Cir.1955). "The claims of the patent provide the concise formal definition of the invention.... It is to these wordings that one must look to determine whether there has been infringement." Autogiro Co. of America v. United States, 384 F.2d 391, 395–96, 181 Ct.Cl. 55 (1967). Although the claims delimit the bounds of the patent, "courts are not confined to the language of the claims

22. See Defendant's Proposed Findings of Fact and Conclusions of Law, at 54.

23. 28 U.S.C. § 1292(c)(2) permits interlocutory appeals to the United States Court of Appeals for the Federal Circuit when a judgment in a civil action for patent infringement is final except for an accounting.

24. Although the parties relied heavily upon Fourth Circuit cases in their proposed conclusions of law, this Court believes that it is unnecessary to require the parties to submit new conclusions. Both relied in part upon cases of the Court of Claims and the Court of Customs and Patent Appeals. In addition, Fourth Circuit law is not at great variance, if at all, with the adopted body of law on the issues presented in this case.

in interpreting their meanings." *Rel-Reeves, Inc. v. United States*, 534 F.2d 274, 282, 209 Ct.Cl. 595 (1976) (per curiam). *See also Esco Corp. v. Tru-Rol Co., Inc.*, 352 F.Supp. 416, 426 (D.Md.1972), *aff'd*, 489 F.2d 699 (4th Cir.1974) (per curiam). Claims are to be construed in light of the specification and the prosecution history. *United States v. Adams*, 383 U.S. 39, 49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572 (1966).

As discussed previously in the findings of facts, the Roper process duplicates Claims 4, 5, and 6 of the '007 patent, and Claims 1, 2, and 3 to the extent that 4, 5, and 6 are dependent upon them. None of Roper's arguments which attempt to take its process outside the '007 patent are persuasive. The accused process literally infringes the plaintiff's patent.[25] The two processes are substantially identical in structure, mode of operation, and results accomplished. In addition, Roper's use of a chromic acid rinse (which the '007 patent mentions in the specification, but not in the claim) does not take the accused process outside the patent. "One cannot avoid infringement by an addition to a patent even though the addition is important to the use intended for the resulting article." *Marston v. J.C. Penney Co.*, 353 F.2d 976, 985 (4th Cir.1965), *cert. denied*, 385 U.S. 974, 87 S.Ct. 515, 17 L.Ed.2d 437 (1966). The Court concludes that the defendant infringed independent Claim 1, 2, and 3 and dependent Claims 4, 5, and 6 of Patent No. 3,444,007.

## C. Validity

Claims 4, 5, and 6, of Patent No. 3,444,-007 are valid. This Court does not accept Roper's arguments that the patent is invalid on three different grounds: obviousness, public sale and use, and indefiniteness.[26]

Under 35 U.S.C. § 282,

A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

This presumption of validity can be overcome only by clear and convincing evidence to the contrary. *Mumm v. Decker & Sons*, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983 (1936); *Astra-Sjuco, A.B. v. United States International Trade Commission*, 629 F.2d 682, 67 CCPA 128 (1980).

*1. Prior Art and Obviousness* —The Court does not agree with Roper that the patent office failed to examine the pertinent prior art, thereby destroying the presumption of validity, and that if this prior art had been considered Maurer's invention would have been obvious, thereby rendering the invention unpatentable.[27] The '007

---

**25.** If this Court had concluded that Roper's process did not literally infringe the '007 patent, it would have been satisfied under the doctrine of equivalents that any minor deviations one might construe from Roper's process could be disregarded. Oxy Metal, upon whom the burden to prove equivalency would fall, has shown under the standards set forth in *Graver Tank & Mfg. Co., Inc. v. Linde Air Products, Inc.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950) and subsequent cases that the Roper process infringes the '007 patent despite unimportant variations, if any. Specifically, the failure to list TEA among the hundreds of complexing agents cited in the specification and the use of a chromic acid rinse (which the '007 patent mentions in the specification, but not in the claim) are not variations that take the Roper process outside of the plaintiff's patent. *See Ziegler v. Phillips Pe-*

*troleum Co.*, 483 F.2d 858, 868–70 (5th Cir.) (discussing the doctrine of equivalents in context of a chemical process patent), *cert. denied*, 414 U.S. 1079, 94 S.Ct. 597, 38 L.Ed.2d 485 (1973); *Continental Paper Bag Co. v. Eastern Paper Bag Co.*, 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed.2d 1122 (1908) (patents are not limited to the preferred embodiments shown in the specification).

**26.** Roper's argument that the patent is invalid because of fraud in the procurement of the patent will be considered in Part IID. The two defenses are related in that the fraudulent failure to disclose relevant prior art information could render the patent both invalid as obvious and unenforceable.

**27.** *See supra* n. 27.

**680**

patent satisfies the requirements of 35 U.S.C. § 103, which reads:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in [35 U.S.C. § 102], if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

■ Before deciding the question of law whether the '007 patent is valid under section 103, *A. & P. Tea Co. v. Supermarket Corp.*, 340 U.S. 147, 155, 71 S.Ct. 127, 131, 95 L.Ed. 162 (1950), this Court must make "several basic factual inquiries: ... the scope and content of the prior art ...; differences between the prior art and the claims at issue ...; and the level of ordinary skill in the pertinent art...." *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966). This Court can also consider the invention's commercial success. *Id.* at 17–18, 86 S.Ct. at 694–695. "Against this background, the obviousness or nonobviousness of the subject matter is determined." *Id.* at 17, 86 S.Ct. at 694. The presumption of validity is rebutted when there is a showing of lack of invention, 35 U.S.C. §§ 103, 282, and is weakened or destroyed where relevant art was not cited or considered. *Heyl & Patterson, Inc. v. McDowell Co.*, 317 F.2d 719, 722 (4th Cir.1963).

The art to which the Maurer '007 patent is directed is the art of metal finishing. Both parties agree that Lum Canadian Patent No. 473,024 is part of this prior art, but disagree whether the Elliott Patent No.

2,975,039, the Elliott Patent No. 2,975,040, and the Prier Patent No. 1,923,502 are part of the relevant prior art. This Court has found that the two Elliott patents are not part of the relevant art under which the obviousness of the '007 patent is examined.[28] The Prier Patent, however, despite its inadequacies,[29] is part of the pertinent prior art. Roper urges no other prior art patent upon this Court.

The '007 patent's presumption of validity is slightly weakened because the patent office did not consider the Prier patent. *See Heyl & Patterson, Inc., supra.* Neither Roper nor its experts relied heavily upon this patent, and the Court will conclude that the '007 patent is not obvious when examined in light of the Prier patent.

Although the failure of the patent office to evaluate the Maurer application in light of the Prier patent weakens the presumption, the presumption is strengthened by the patent office's consideration of the Lum Canadian patent. *Kahn v. Dynamics Corp. of America*, 508 F.2d 939, 942 (2d Cir.), *cert. denied*, 421 U.S. 930, 95 S.Ct. 1657, 44 L.Ed.2d 88 (1975). The presumption of validity is not weakened by Oxy Metal's characterization and representation—or "mischaracterization and misrepresentation" as Roper claims—of the Lum Canadian patent. Oxy Metal's efforts before the patent office were not improper and do not require a weakening of this presumption. In addition, the commercial success of the '007 patent[30] helps support a conclusion of nonobviousness. *See Graham, supra; Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538–39 (Fed.Cir. 1983); *Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144, 1150–51 (Fed.Cir.1983).

■ A person of ordinary skill in metal finishing art[31] in 1963 to 1968 would not have considered Maurer's invention obvi-

---

28. *See supra*, at 674.

29. *See supra*, at 674.

30. *See supra*, at 675. *See also Universal, Inc. v. Kay Manufacturing Corp.* 301 F.2d 140, 148 (4th Cir.1962) (mimicing of patent process after using that process).

31. This Court found that a person of ordinary skill in metal finishing art would have a B.S. in chemistry and two or three years of laboratory experience. *See supra*, at 673. *See also* defendant's Post Trial Proposed Findings of Fact and Conclusions of Law, at 57.

ous. This Court concludes that the prior art before the patent office, the Prier patent, and even the two Elliott patents did not disclose or teach the '007 patent method of treating zinc or zinc alloy surfaces.[32] The claims in suit are not obvious under section 103 in view of the prior art. Maurer made a contribution to the art, and went beyond merely "adopting" the Elliott, Prier, and Lum patented processes.

■ 2. *Public Use and Sale*—The '007 patent is not invalid under 35 U.S.C. § 102(b). Contrary to the conclusion urged by Roper, Maurer's pre-painting treatment was not "in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States ...." 35 U.S.C. § 102(b). The Court rejects Roper's argument that the relevant application date is the date when the amendment coining the term "complex oxide" was filed—July 5, 1966. Oxy Metal first marketed its process in 1964, which is after, not before, the date of the application. For the purposes of section 102(b) the original 1963 application was sufficiently precise so as to disclose the limits of the patent despite the subsequent five-year struggle. *See Muncie Gear Co. v. Outboard Marine & Mfg. Co.*, 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171 (1942); *Larsen Products Corp. v. Perfect Paint Products*, 191 F.Supp. 303, 316 (D.Md. 1961); *Chicopee Manufacturing Corp. v. Kendall Co.*, 288 F.2d 719, 723 (4th Cir. 1961) (claims revamped when methods discovered to be commercially impracticable).

■ ■ 3. *Indefiniteness*—The Court rejects Roper's argument that the term "complex oxide" rendered the patent invalid for indefiniteness. The '007 patent satisfies the requirements of 35 U.S.C. § 112, including the mandate that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." The pat-

ent makes it clear what is being claimed, and what is within the scope of the claim. It is also evident what Oxy Metal regards as Mauer's invention. *See Application of Zahn*, 617 F.2d 261, 266–67 (Cust. & Pat. App.1980). The statutory requirement of particularity and distinctness in claims is met when they clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise. *United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236, 63 S.Ct. 165, 169, 87 L.Ed. 232 (1942). The subsequent amendment to the original patent application does not make the original application indefinite and does not suggest that the subsequently issued patent is indefinite.

D. *Fraud*

■ Oxy Metal's '007 patent was not obtained by fraud and, therefore, the patent is not invalid or unenforceable for this reason. The failure to disclose three alleged prior art patents and test data regarding the Lum Canadian patent was not fraudulent. The undisclosed information was not material to the patent examiner's decision, and Oxy Metal did not have the requisite intent to render the patent unenforceable. The Court rejects Roper's characterization of the evidence, and concludes that the patent is valid.

"Establishing that a patent was procured by fraud or with such egregious conduct as to render it unenforceable requires clear, unequivocal, and convincing evidence of an intentional misrepresentation or withholding of a material fact from the PTO." *Orthopedic Equipment Co., Inc. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1383 (Fed.Cir.1983); *accord Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144, 1151 (Fed.Cir. 1983). Despite this high standard, "proof of the actual state of mind of the applicant or persons associated with or representing an applicant is not required. 'The intent

---

**32.** *See supra*, at 19–23. It is significant that those highly skilled in the art of metal finishing, including the defendant's expert, Jernstedt, who worked with Lum, did not develop the process

patented by Maurer. *See Goodyear Tire & Rubber Co. v. Ray-O-Vac Co.*, 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721 (1944).

element ... may be proven by a showing of acts the natural consequences of which are presumably intended by the actor.'" *Rohm and Haas Co. v. Crystal Chemical Co.*, 722 F.2d 1556 (Fed.Cir.1983), *quoting, Kansas Jack, supra*, at 1151, 1152.[33] For example, statements made with gross negligence as to their truth may establish the requisite intent. *Norton v. Curtiss*, 433 F.2d 779, 795–96, 57 CCPA 1384 (1970). "Although inequitable conduct requires less stringent proofs as to both materiality and intent than common law fraud, mere evidence of simple negligence, oversight, or an erroneous judgment made in good faith not to disclose prior art is not sufficient to render a patent unenforceable." *Orthopedic Equipment, supra*, at 1383.

Oxy Metal's failure to disclose the two Elliott patents and the Prier patent and certain test data relevant to the Lum Canadian patent was neither intentional nor careless enough to render the patent unenforceable for fraud or inequitable conduct. Even in light of Oxy Metal's duty to disclose relevant test material and prior patents, *see Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945), this Court concludes that the plaintiff's judgment was made in good faith and was at the most a negligent oversight. *See Orthopedic Equipment, supra*. Even if this Court were to accept Roper's contention that the undisclosed prior art and test data would have altered the patent office's decision, this Court would not conclude that Oxy Metal's behavior warranted holding the patent unenforceable for fraud or inequitable conduct. *See Kansas Jack, supra*, at 1151. The Court accepts the plaintiff's explanation as to the nondisclosure of certain information.[34]

The Court also concludes that the undisclosed information would not have been material to the patent office's decision to issue the patent. As discussed earlier, the three prior art patents urged upon the Court by Roper would not have affected the decision. The Elliott patents are not pertinent to the art from which the '007 patent arose. The Prier patent is inarticulate and was not even relied upon significantly by Roper. The undisclosed test data, although marginally relevant, would not have been material to the patent office's decision. The data that was disclosed (with or without the undisclosed data) overcomes the original objections pertaining to the Lum Canadian patent, and supports the issuance of the '007 patent. The undisclosed patents and test data would not have been "important to the PTO in making its decision." *Kansas Jack, supra* at 1152.

Patent No. 3,444,007 is not invalid for fraud or inequitable conduct in the application process.

### E. *Attorney Fees*

 The Court will not grant the plaintiff's request for attorney fees under 35 U.S.C. § 285, which provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." An award is within the discretion of this Court. *Orthopedic Equipment Co. v. All Orthopedic Appliances*, 707 F.2d 1376, 1384 (Fed.Cir.1983). "The purpose of the statute is to permit the court to award fees in an extraordinary case to prevent gross injustice ...." *Stillman v. Edmund Scientific Co.*, 522 F.2d 798, 800 (4th Cir. 1975). Proper bases for an award under section 285 include "willful infringement [and] the assertion of sham or frivolous defenses that increase significantly the patent holder's legal expenses through unduly

**33.** In *Kansas Jack*, the Court held that
[w]here one who knew, or should have known, that a piece of prior art, or other information would be material, i.e., important to the PTO in making its decision, a failure to disclose the art or information can be sufficient proof that a wrongful intent existed to mislead the PTO, and may result in a finding

of what has come to be called "fraud" on the PTO.
*Id.* at 1152. As will be discussed *infra*, the nondisclosed information was not material. Thus, no inference of fraud or inequitable conduct will be drawn from the mere failure to disclose.

**34.** *See supra*, at 676–678.

protracted litigation." *Lam, Inc. v. Johns-Mansville Corp.*, 668 F.2d 462, 476 (10th Cir.) *cert. denied*, 456 U.S. 1007, 102 S.Ct. 2298, 73 L.Ed.2d 1302 (1982). Although some of the defendant's arguments may be strained,[35] this Court will not award attorney fees to the plaintiff. On the whole, genuine disputes of fact and of law did exist.

### F. Accounting and Injunction

The plaintiff has requested an accounting to determine damages as a result of the infringement and an injunction under seal to enjoin Roper from further infringement of Claims 4, 5, and 6 of Patent No. 3,444,-007.

■ 1. *Accounting*—The plaintiff is entitled to an accounting against the defendant to fix damages adequate to compensate it for infringement. The plaintiff should present an accounting to this Court within sixty days of the date of this opinion unless, of course, the defendant files an appeal within the appropriate time period. *See* 28 U.S.C. § 1292(c)(2). The accounting should be accompanied by appropriate memoranda and affidavits. A hearing will be set, if necessary.

2. *Injunctive Relief*—This Court will not enter an order under seal pursuant to 35 U.S.C. § 283, enjoining the defendant from further infringement of Claims 4, 5, and 6, of Patent No. 3,444,007. An injunction would be inappropriate because there is no threat of future infringement. *See, e.g., Aluminum Extrusion Co. v. Soule Steele Co.*, 260 F.Supp. 221, 225 (C.D.Cal.1966).

### ORDER

For the reasons stated in an Opinion dated January 18th, 1984, it is this 18th day of January, 1984,

ORDERED:

1. That judgment be and is entered in favor of the plaintiff against the defendant; and,

35. *See, e.g., supra,* at 675–678.

2. That the Clerk of the Court shall mail a copy of the Opinion and Order to all counsel of record.